SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**State v. James L. Legette** (A-12-15) (076124)

**Argued September 13, 2016 -- Decided January 12, 2017**

**Fernandez-Vina, J., writing for a majority of the Court.**

In this appeal, the Court considers whether, during an investigatory stop, it is permissible for a police officer to follow suspects into their homes and seize evidence.

When an officer was called to investigate a noise complaint at an apartment complex, he saw defendant James L. Legette standing on a common porch. As the officer approached, Legette opened the door to that area partway. The officer smelled burnt marijuana, stepped onto the porch, and introduced himself as a police officer. Legette began to walk away. The officer stopped him and asked him for identification. When Legette offered to retrieve identification from his apartment, the officer said he would have to accompany Legette. Legette did not respond but continued to his apartment with the officer following. As they were walking, the officer noted a bulge in Legette's sweatshirt.

Legette and the officer entered Legette's apartment. Legette presented his identification, and the officer began a radio transmission to check for outstanding warrants. Legette, meanwhile, removed his sweatshirt and asked a woman who was present to take it to the bedroom. The officer interrupted the transmission and collected the sweatshirt from the bedroom. Legette appeared increasingly anxious, so the officer escorted him outside.

The warrant inquiry came back negative, and Legette did not consent to a search of his sweatshirt. The officer seated Legette in his patrol car and had his police dog sniff the sweatshirt. The dog moved the sweatshirt and a metallic noise was heard. The officer then found a loaded handgun in the sweatshirt.

Legette was indicted on second-degree unlawful possession of a handgun and second-degree possession of a weapon by a convicted person. He moved to suppress the handgun, challenging the validity of the search. The trial court denied the motion. Legette then pleaded guilty to possession of a weapon by a convicted person and was sentenced to a term of five years without parole.

Legette appealed the suppression ruling, but the Appellate Division affirmed. State v. Legette, 441 N.J. Super. 1, 11 (App. Div. 2015). The appellate panel relied on Washington v. Chrisman, 455 U.S. 1, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982), and State v. Bruzzese, 94 N.J. 210 (1983), cert. denied, 465 U.S. 1030, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984), which concluded that it was reasonable for police officers to follow arrestees into their homes. The panel reasoned that the same public safety concerns that arise during arrests also arise during investigatory stops. The panel therefore found that officers are permitted to follow detainees as well as arrestees into their homes.

The Court granted Legette's petition for certification. 223 N.J. 355 (2015).

**HELD**: Chrisman and Bruzzese do not support warrantless entries into detainees' homes; they apply only to cases in which a suspect has been arrested prior to the officer's entry into the home. Here, because the State failed to meet its burden of demonstrating that the warrantless entry fell within a recognized exception to the warrant requirement, the entry was illegal and the evidence obtained as a result of that entry should have been suppressed.

1. In Chrisman, supra, the United States Supreme Court concluded that it was valid for an officer to accompany a college student found carrying a bottle of gin into his dormitory room to retrieve identification. The Court found that the officer had placed the student under lawful arrest; therefore, "[t]he officer had a right to remain literally at [the student's] elbow at all times." 455 U.S. at 6, 102 S. Ct. at 816, 70 L. Ed. 2d at 785. In reaching this holding, the Court recognized that every arrest poses a risk of danger to the arresting officer. (pp 8-9)

2. In Bruzzese, this Court adopted the Chrisman rule as the law of New Jersey. Officers in Bruzzese went to the defendant's house and stated that they intended to bring him in for an outstanding warrant. The Court held that it was permissible for the officers to follow the defendant into his room while he retrieved a jacket and shoes. The Court reasoned that "the privacy rights of an individual who is placed under lawful arrest are diminished," while "the arresting police officer is entitled to the protection he or she would receive under this rule." Bruzzese, supra, 94 N.J. at 232. (pp 9-10)

3. The holdings in both Chrisman and Bruzzese were expressly contingent on the fact that the defendants in those cases had been placed under arrest prior to the officer's entry into the residence. Chrisman and Bruzzese apply only when a suspect has been arrested due to the diminished expectation of privacy of an individual under arrest. Because Legette was not an arrestee but rather a detainee, Chrisman and Bruzzese are not directly on point. (pp 11-13)

4. Both the Federal and New Jersey State Constitutions guarantee the right to be free from unreasonable searches and seizures. Accordingly, a lawful search must be prefaced by a warrant obtained upon probable cause unless the search falls within one of the few well-delineated exceptions to the warrant requirement. If no warrant was sought, the State bears the burden of demonstrating the validity of the search. The State's burden is particularly heavy when the search is conducted after warrantless entry into a home, because the home bears a special status. This case requires the Court to determine whether the public safety concerns underpinning investigatory stops can overcome the special status accorded to the home. (pp. 13-15)

5. Because the reasonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest, there are certain limitations on the scope of such stops. The Court has held that the investigative methods employed in a Terry stop should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. Because officers are limited to taking self-protective measures during investigatory stops, the Court finds that Chrisman and Bruzzese do not support warrantless entries into detainees' homes and declines to expand the scope of investigatory stops to encompass police entry into the home. (pp 15-16)

6. Here, the officer failed to conduct a routine investigatory pat-down before entering the apartment, which belied the concern for safety. The Court notes that it is irrelevant whether the officer had probable cause to effectuate an arrest based on the smell of marijuana; the inquiry under Chrisman and Bruzzese is whether Legette had been arrested when the officer followed him into the apartment. Finally, the State did not show that Legette thought he could refuse entry into his apartment, so the Court does not find that the search was consensual. Because the State failed to meet its burden of demonstrating that the search in this case fell within a recognized exception to the warrant requirement, the entry was illegal and the evidence obtained as a result of that entry should have been suppressed. (pp 16-18)

  **JUSTICE SOLOMON, DISSENTING**, expresses the view that the officer had probable cause to arrest Legette because he smelled burned marijuana, that his decision to accompany Legette rather than immediately arrest him was reasonable, that this accompaniment did not vitiate the probable cause, and that the same policy concerns for officer safety that apply to arrestees also apply to detainees. In Justice Solomon's view, the officer's decision to allow Legette to retrieve identification rather than immediately place him under arrest mirrors the facts of Chrisman, and Chrisman is equally applicable to pre-arrest situations as to post-arrest situations.

  The judgment of the Appellate Division is **REVERSED** and the matter is **REMANDED** for a new trial.

  **CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion. Justice SOLOMON filed a separate, dissenting opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

       v.

JAMES L. LEGETTE (a/k/a JAMES
LEGGETTE, JR. and JAMES
LEGETTE),

    Defendant-Appellant.


        Argued September 13, 2016 – Decided January 12, 2017

        On certification from the Superior Court,
        Appellate Division, whose opinion was
        reported at 441 N.J. Super. 1 (App. Div.
        2015).

        Stefan Van Jura, Deputy Public Defender II,
        argued the cause for appellant (Joseph E.
        Krakora, Public Defender, attorney; Mr. Van
        Jura and Samuel Feder, Assistant Deputy
        Public Defender, on the briefs).

        Steven A. Yomtov, Deputy Attorney General,
        argued the cause for respondent (Christopher
        S. Porrino, Attorney General of New Jersey,
        attorney).


    JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

    The issue on appeal is whether, during an investigatory stop, it is permissible for a police officer to follow suspects into their homes and seize evidence.

In response to a noise complaint, an officer arrived at Defendant James L. Legette's apartment complex, where he observed defendant standing with another man in a public area. Because defendant began to walk away when the officer identified himself, the officer commenced an investigatory stop, asking defendant for identification. When defendant offered to retrieve identification from his apartment, the officer said he would have to accompany defendant. While in his apartment, defendant removed the sweatshirt he was wearing. The officer seized the sweatshirt and ultimately discovered a handgun in its pocket.

The trial court denied defendant's motion to suppress the handgun, and the Appellate Division affirmed. The lower courts largely relied on Washington v. Chrisman, 455 U.S. 1, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982), and State v. Bruzzese, 94 N.J. 210 (1983), cert. denied, 465 U.S. 1030, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984), which concluded that it was reasonable for police officers to follow arrestees into their homes.

For the reasons set forth in this opinion, we decline to extend Chrisman and Bruzzese to detainees. Although warrantless entries into the home require probable cause, investigatory stops require the lower standard of reasonable suspicion. We therefore hold that, when conducting an investigatory stop, it

2

is not permissible for an officer to follow suspects into their homes.

I.

On the night of January 17, 2012, Somers Point Police Officer Richard Dill ("Dill") responded to a noise complaint in an apartment complex. Upon arrival, Dill noticed two men standing on a common porch. He parked and entered the building from another direction through a common hallway. Dill heard music and loud voices. As Dill neared the door to the common porch where he had seen the two men from the parking lot, defendant opened the door partway. Dill smelled the odor of burnt marijuana through the open door.

Dill walked onto the common porch and identified himself. Defendant walked away from Dill, heading toward the parking lot. Dill asked defendant where he was going, and defendant replied that he was going to his car. Dill inquired whether defendant had any identification. Defendant said that his identification was in his apartment and volunteered to retrieve it. Dill told defendant that he would have to accompany him to his apartment under the circumstances. Defendant did not respond and continued walking upstairs.

As defendant was walking, Dill noticed a bulge in the pocket of defendant's sweatshirt. He followed defendant into the bedroom of the apartment, where defendant picked up his

3

wallet, removed his identification, and handed it to Dill.  Dill and defendant then went into the living room, where Dill radioed the information from defendant's identification to dispatch.

Defendant took off his sweatshirt, handed it to a woman who was also in the living room, and instructed her to put it in the bedroom, which she did.  Dill interrupted his radio transmission and told defendant that he would need to examine the sweatshirt. Dill and defendant went to the bedroom, where defendant stepped over the sweatshirt he had been wearing and grabbed another one from the closet.  Dill picked up the sweatshirt defendant had been wearing from the floor.

Dill and defendant returned to the living room, where Dill resumed his radio transmission regarding the existence of any outstanding warrants.  Defendant became visibly nervous, so Dill asked defendant to step outside where Dill's vehicle, his K-9, and a backup officer were located.  Outside, Dill asked defendant to have a seat on the building steps.  Defendant continued to appear anxious as Dill placed the sweatshirt on the ground.  Dill informed defendant that he would be handcuffed and detained while Dill investigated.

The warrant inquiry revealed no outstanding warrants. Defendant did not consent to a search of the sweatshirt, so Dill placed defendant in the back of the patrol vehicle to wait while Dill conducted a K-9 search for drugs.  Dill got another

4

sweatshirt and a towel from his patrol vehicle and placed them on the ground next to defendant's sweatshirt. The dog put his nose in defendant's sweatshirt, grabbed it in its mouth, and dropped it onto the pavement. The sweatshirt made a clanking noise as it hit the ground. Dill picked up the sweatshirt and felt a handgun in the pocket, which he seized. The handgun was loaded.

A grand jury indicted defendant on second-degree unlawful possession of a handgun without a permit, contrary to N.J.S.A. 2C:39-5(b), and second-degree possession of a weapon by a convicted person, contrary to N.J.S.A. 2C:39-7.

Defendant filed a motion to suppress, challenging the validity of the search. The State argued that Dill had properly detained defendant due to a reasonable and articulable suspicion that a crime had been committed, that entry into defendant's home was lawful, and that the sweatshirt was in plain view.

After hearing testimony and considering additional briefing, the trial court denied defendant's motion to suppress. Defendant ultimately pleaded guilty to possession of a weapon by a convicted person and was sentenced to a term of five years without parole.

Defendant appealed the suppression ruling. The State conceded on appeal that entering defendant's residence and detaining defendant were more than reasonably necessary to

investigate whether defendant was in possession of marijuana. The State asserted -- for the first time on appeal -- that the evidence should not be excluded under the theory of inevitable discovery because Dill would have located the handgun if he had used proper investigatory procedures.

The Appellate Division affirmed the trial court's denial of the suppression motion. State v. Legette, 441 N.J. Super. 1, 11-12 (App. Div. 2015). The panel applied Chrisman and Bruzzese, concluding that "an officer who has lawfully detained a suspect in an investigatory stop, like an officer who has lawfully arrested a subject, need not let the suspect out of his sight or presence during the detention." Id. at 20. We granted defendant's petition for certification. 223 N.J. 355 (2015).

II.

A.

Defendant argues that the reasonable suspicion necessary to justify an investigatory stop under Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is never sufficient to support warrantless entry into a home, which requires a showing of probable cause. Defendant stresses that Terry's exception to the warrant requirement is narrowly tailored to allow an officer to search a suspect in a public setting. Accordingly, defendant argues that Terry stops must be limited in scope, brief in duration, and aimed at proving or disproving an officer's

6

suspicion that crime is afoot. Finally, defendant asserts that the circumstances of this case present no exigencies supporting the exigent-circumstances exception to the warrant requirement.

B.

The State counters that permitting police officers to accompany a suspect who has been detained in a Terry stop is a logical extension of Chrisman and Bruzzese because the movements of a detained suspect pose as valid a safety concern as those of an arrestee. The State contends, moreover, that Dill had probable cause to arrest defendant based on the smell of marijuana and that the Court should therefore consider the search to be a search incident to arrest. Finally, the State asserts that defendant consented to the warrantless entry, as demonstrated by defendant's silence when Dill stated that he would have to accompany defendant inside the apartment.[1]

III.

---

[1] The State also argues that discovery of the handgun was inevitable, because it would have been found pursuant to a search incident to arrest for possession of marijuana. Because the State raised this argument for the first time on appeal, we decline to consider it. State v. Robinson, 200 N.J. 1, 20 (2009) ("[I]t is a well-settled principle that our appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest." (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973))).

7

We review the scope of the holdings set forth in Chrisman and Bruzzese.

A.

In Chrisman, supra, a police officer stopped a college student who was carrying a bottle of gin and asked him for identification. 455 U.S. at 3, 102 S. Ct. at 815, 70 L. Ed. 2d at 783. The student "said that his identification was in his dormitory room and asked if the officer would wait while he went to retrieve it." Ibid. The officer explained that under the circumstances, he would have to accompany the student, and the student replied, "OK." Ibid. While standing in the doorway of the dormitory room, the officer noticed drugs and drug paraphernalia lying on a nearby desk. Id. at 4, 102 S. Ct. at 815, 70 L. Ed. 2d at 783. The student and his roommate subsequently consented to a search of the room, which yielded additional contraband. Ibid.

The Supreme Court concluded that it was valid for the officer to accompany the student to his room and upheld the seizure of drugs under the "plain view" exception to the Fourth Amendment. Id. at 5-8, 102 S. Ct. at 816-17, 70 L. Ed. 2d at 784-86. The Court found that the officer had placed the student under lawful arrest; therefore, "[t]he officer had a right to remain literally at [the student's] elbow at all times." Id. at 6, 102 S. Ct. at 816, 70 L. Ed. 2d at 785.

8

The Court rejected the claim that exigent circumstances were required to justify the officer's decision to follow the defendant into his room.  Id. at 6, 102 S. Ct. at 816-17, 70 L. Ed. 2d at 785.  The Court reasoned that "[e]very arrest must be presumed to present a risk of danger to the arresting officer" because "[t]here is no way for an officer to predict reliably how a particular subject will react to [the] arrest."  Id. at 7, 102 S. Ct. at 817, 70 L. Ed. 2d at 785.  Accordingly, it was "not 'unreasonable' . . . for a police officer, as a matter of routine, to monitor the movements of an arrested person, as his judgment dictates, following the arrest."  Ibid.

B.

We subsequently adopted the Chrisman rule as the law of New Jersey.  Bruzzese, supra, 94 N.J. at 234.  In Bruzzese, police officers went to the defendant's house to execute an outstanding arrest warrant for contempt, which was pending in municipal court.  Id. at 214.  The defendant came downstairs clad in a t-shirt and pants, but no shoes.  Id. at 215.  When the officers stated that they intended to bring the defendant in for the outstanding warrant, the defendant stated "that he wanted to put on shoes and a jacket before going outside."  Ibid.  The officers followed the defendant to his bedroom.  Ibid.  While in the bedroom, one of the officers noticed a pair of boots with a distinctive sole matching a boot imprint that had been left at

9

the scene of an unsolved robbery.  Ibid.  The officer seized the boots.  Ibid.

Based on the holding in Chrisman, this Court concluded that the officers in Bruzzese could "monitor the movements of an arrested person following the individual's arrest."  Id. at 232. In Bruzzese, this Court, like the United States Supreme Court, stressed that the police officer was permitted to follow the defendant into his bedroom because the defendant was under lawful arrest at the time.  Ibid.  In balancing the interests of public safety against the individual's privacy interest, this Court reasoned that "the privacy rights of an individual who is placed under lawful arrest are diminished," while "the arresting police officer is entitled to the protection he or she would receive under this rule."  Ibid.

This Court further noted that there are limitations on a police officer's right to accompany an arrestee; however, we explained that police monitoring must be "objectively reasonable."  Id. at 234.  For example, this Court explained that police officers cannot lead an arrestee from place to place in an effort to use the arrestee's presence as a pretext to search another area.  Id. at 234-35.  Finding no such improper activity in Bruzzese, this Court concluded that following the defendant upstairs while he retrieved a jacket and shoes was reasonable.  Id. at 235.

C.

The holdings in both Chrisman and Bruzzese were expressly contingent on the fact that the defendants in those cases had been placed under arrest prior to the officer's entry into the residence. The Supreme Court observed in Chrisman that "the officer had placed [defendant] under lawful arrest, and therefore was authorized to accompany him to his room for the purpose of obtaining identification." Chrisman, supra, 455 U.S. at 6, 102 S. Ct. at 816, 70 L. Ed. 2d at 784 (emphasis added). Further, the Supreme Court explained that it is reasonable for an officer "to monitor the movements of an arrested person" due to a "compelling" need to ensure the officer's safety and maintain "the integrity of the arrest." Id. at 7, 102 S. Ct. at 817, 70 L. Ed. 2d at 785 (emphasis added). In balancing the rights of the officer against those of the defendant, the Supreme Court concluded that such surveillance does not impinge upon the privacy rights "of an individual who has been arrested." Ibid. (emphasis added).

Similarly, we stressed in Bruzzese that an arresting officer may remain at the suspect's side "so long as the arrest is lawful." Bruzzese, supra, 94 N.J. at 232 (emphasis added). In reaching that conclusion, we balanced the interest in protecting the police officer against the "diminished" privacy

rights of "an individual who is placed under lawful arrest."
Ibid. (emphasis added).

The dissent, contrary to Rule 1:36-3, relies on unpublished documents not part of this record to create a scenario as to what the outcome of the stop in Chrisman, supra, 455 U.S. at 1, 102 S. Ct. at 812, 70 L. Ed. 2d at 778, may have been. Based on conjecture, the dissent argues that the holding in Chrisman applies in situations when an individual is detained. The holding in Chrisman is clear and unambiguous. It applies only when an individual has been arrested. See id. at 6, 102 S. Ct. at 816, 70 L. Ed. 2d at 784 (stating that officer had placed defendant "under lawful arrest, and therefore was authorized to accompany him to his room" (emphasis added)). To interpret Chrisman otherwise also defies our reasoning in Bruzzese, in which we unequivocally conditioned a police officer's right to "remain at [a defendant's side]" upon placing the defendant under "lawful arrest." Bruzzese, supra, 94 N.J. at 232.

The flaw in the dissent's argument is further evidenced by its reliance on the Appellate Division's holding. See post at ___ (slip op. at ___). The Appellate Division did not find that Chrisman and Bruzzese applied to non-arrest cases. Rather, it reasoned that the holdings in those cases should be extended to pre-arrest detainees. See Legette, supra, 441 N.J. Super. at 19 (acknowledging that "the Supreme Court in Chrisman refers to the

12

student as having already been placed under arrest" but concluding that "we do not think that this characterization makes Chrisman any less applicable to a pre-arrest situation" (quoting United States v. Roberts, 612 F.3d 306, 308, 310 n.4 (5th Cir.), cert. denied, 562 U.S. 1116, 131 S. Ct. 839, 178 L. Ed. 2d 570 (2010)).

We conclude that Chrisman and Bruzzese apply only when a suspect has been arrested due to the diminished expectation of privacy of an individual under arrest. See Chrisman, supra, 455 U.S. at 7, 102 S. Ct. at 817, 70 L. Ed. 2d at 785; Bruzzese, supra, 94 N.J. at 232. Because defendant in this case was not an arrestee but rather a detainee, Chrisman and Bruzzese are not directly on point. We must therefore determine whether the balance of interests supports Officer Dill's actions here.

IV.

The question of whether Chrisman and Bruzzese should be extended to allow police to accompany detainees as well as arrestees into their homes is a purely legal question. Accordingly, we conduct a de novo review. State v. Rockford, 213 N.J. 424, 440 (2013).

A.

The Federal and New Jersey State Constitutions guarantee the right to be free from unreasonable searches and seizures. U.S. Const. amend. IV; N.J. Const. art. 1, ¶ 7. In accord with

13

those provisions, a lawful search must be prefaced by a warrant obtained upon probable cause "unless [the search] falls within one of the few well-delineated exceptions to the warrant requirement." State v. Maryland, 167 N.J. 471, 482 (2001) (alteration in original) (quoting State v. Citarella, 154 N.J. 272, 278 (1998)). If no warrant was sought, the State bears the burden of demonstrating the validity of the search. State v. Pineiro, 181 N.J. 13, 19-20 (2004).

The State's burden is particularly heavy when the search is conducted after warrantless entry into a home. We have generally "applied a more stringent standard of the Fourth Amendment to searches of a residential dwelling." State v. Edmonds, 211 N.J. 117, 129 (2012) (quoting Bruzzese, supra, 94 N.J. at 217). The home bears a "special status" because "unlawful, warrantless searches and seizures within the home are [the] 'chief evil against which the wording of the Fourth Amendment is directed.'" State v. Johnson, 193 N.J. 528, 553-54 (2008) (quoting Welsh v. Wisconsin, 477 U.S. 740, 748, 104 S. Ct. 2091, 2097, 80 L. Ed. 2d 732, 742 (1984)).

Outside the home, courts have adjudged certain warrantless police encounters as permissible, including street-level investigatory stops, also known as Terry stops. Maryland, supra, 167 N.J. at 486 (citing Terry, supra, 392 U.S. at 22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). We must determine whether

14

the public safety concerns underpinning investigatory stops can overcome the special status accorded to the home.

B.

An investigatory stop is constitutionally lawful "if it is based on 'specific and articulable facts which, taken together with rational inferences from those facts,' give rise to a reasonable suspicion of criminal activity." State v. Rodriguez, 172 N.J. 117, 126 (2002) (quoting Terry, supra, 392 U.S. at 21, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). We have acknowledged that when a person is detained pursuant to an investigatory stop, "a person's freedom of movement is restricted." State v. Elders, 192 N.J. 224, 246 (2007). Further, a detainee may be subjected to the "invasion of privacy that occurs in a pat-down of a person's body." State v. Smith, 134 N.J. 599, 619 (1994). Nevertheless, because the "[r]easonable suspicion necessary to justify an investigatory stop is a lower standard than the probable cause necessary to sustain an arrest," State v. Stovall, 170 N.J. 346, 356 (2002), there are certain limitations on the scope of such stops.

Terry stops are "narrowly drawn . . . to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual." Terry, supra, 392 U.S. at 27, 88 S. Ct. at 1883, 20 L. Ed. 2d at 909. Thus, we have

established that "the investigative methods employed [in a Terry stop] should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." State v. Privott, 203 N.J. 16, 31 (2010) (alteration in original) (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325-26, 75 L. Ed. 2d 229, 238 (1983)).

Because officers are limited to taking self-protective measures during investigatory stops, we find that Chrisman and Bruzzese do not support warrantless entries into detainees' homes. We therefore decline to expand the scope of investigatory stops to encompass police entry into the home. We conclude that Chrisman and Bruzzese apply only to cases in which a suspect has been arrested prior to the officer's entry into the home. See Bruzzese, supra, 94 N.J. at 232.

V.

The facts of this case support our legal conclusion. The State argues that it was reasonable for Dill to accompany defendant into his apartment because defendant could have obtained a weapon in the apartment that could later have been used against the officer. The State also asserts that Dill had authority to monitor defendant to prevent flight.

While we recognize that officer safety is a concern during any encounter with a suspect, it is less compelling under the facts here. By failing to conduct a routine investigatory pat-

16

down before entering the apartment, which would have been proper under Terry, Dill belied the concern for safety. Accordingly, under the circumstances, Dill's entry into defendant's home did not promote public safety.

The State also contends that the smell of marijuana gave Dill probable cause to arrest defendant. Based on that probable cause, the State argues that it was reasonable for Dill to accompany defendant into his home as Dill would an arrestee.

It is irrelevant whether Dill had probable cause to effectuate an arrest; the inquiry under Chrisman and Bruzzese is whether defendant had been arrested when Dill followed defendant into his home. Here, it is not disputed that defendant had not been placed under arrest when Dill followed defendant into the apartment. The warrantless entry was thus improper, and the evidence seized as a result of that unlawful entry should be suppressed. State v. Gibson, 218 N.J. 277, 298 (2014).

The dissent cites two cases in support of the claim that Officer Dill's conduct was appropriate because there was probable cause for an arrest: State v. Nishina, 175 N.J. 502 (2003), and State v. Vanderveer, 285 N.J. Super. 475 (App. Div. 1995). See post at ___ (slip op. at ___). Neither Nishina nor Vanderveer involved evidence seized after police entry of the defendants' homes, however. Nishina, supra, 175 N.J. at 508, involved a search of a motor vehicle. And Vanderveer, supra,

17

285 N.J. Super. at 477, involved a search on an open porch. Those cases therefore do not justify Officer Dill's conduct here.

The State asserts, finally, that there was consent for Dill to enter the apartment. The factual record before us does not support this conclusion. To establish that defendant waived his Fourth Amendment rights, the State must show that defendant had "knowledge of the right to refuse consent." State v. Johnson, 68 N.J. 349, 353-54 (1975). Dill exerted his authority over defendant by stopping defendant from walking toward the parking lot. Subsequently, defendant did not respond when Dill indicated that he would have to accompany defendant into the apartment. Under these circumstances, the State has not shown that defendant thought he could refuse entry into his apartment. Therefore, we do not find that the search was consensual.

In sum, we find that the warrantless entry into defendant's home was justified neither by the fact that defendant had been detained in the course of a Terry stop, nor by consent. Because the State has failed to meet its burden of demonstrating that the warrantless entry fell within a recognized exception to the warrant requirement, we hold that the entry was illegal and that the evidence obtained as a result of that entry should have been suppressed.

VI.

18

For the reasons set forth above, the judgment of the Appellate Division is reversed and the case is remanded for a new trial.


CHIEF JUSTICE RABNER and JUSTICES LaVECCHIA, ALBIN, PATTERSON, and TIMPONE join in JUSTICE FERNANDEZ-VINA's opinion. Justice SOLOMON filed a separate, dissenting opinion.

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

        v.

JAMES L. LEGETTE (a/k/a JAMES
LEGGETTE, JR. and JAMES
LEGETTE),

    Defendant-Appellant.


    JUSTICE SOLOMON, dissenting.

    The majority's decision is based upon the notion that the holdings in Washington v. Chrisman, 455 U.S. 1, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982), and State v. Bruzzese, 94 N.J. 210 (1983), cert. denied, 465 U.S. 1030, 104 S. Ct. 1295, 79 L. Ed. 2d 695 (1984), were "expressly contingent" on the defendants' arrest prior to the officers following them inside their home. However, this distinction disregards the facts of both cases and the reasoning behind their respective findings.  The Appellate Division's opinion, on the other hand, is consistent with Chrisman and Bruzzese.  Therefore, I respectfully dissent.

    The facts of Chrisman, as explained by the State of Washington's trial and appellate courts, indicate that the defendant was detained, like defendant here, and was not placed under arrest until the drugs were found in his dorm room.  On

1

the evening of January 21, 1978, Officer Richard Daugherty of the Washington State University Police Department approached a university dormitory to investigate an unrelated matter. State v. Chrisman, 600 P.2d 1316, 1317 (Wash. Ct. App. 1979). At the same time, Carl Overdahl, defendant Chrisman's roommate, was leaving the same dormitory while carrying a half gallon of gin. Ibid. Believing Overdahl to be under the legal drinking age of 21, Officer Daugherty asked him for identification. Ibid. Overdahl explained that his identification was in his dorm room and asked Officer Daugherty to wait while he retrieved it. Ibid. The parties' briefs to the Washington Supreme Court explain that "Officer Daugherty indicated to [] Overdahl that since [he] was under police detention, [Officer Daugherty] would not allow him to leave without an officer accompanying him to his room." (emphasis added). Overdahl did not object to the police escort. Chrisman, supra, 455 U.S. at 3, 102 S. Ct. at 815, 70 L. Ed. 2d at 783. It was not until Officer Daugherty and Overdahl were waiting for the elevator that Overdahl admitted to being nineteen years old. Chrisman, supra, 600 P.2d at 1317.

When they arrived at Overdahl's room, Officer Daugherty first only leaned against the doorway. Ibid. At that point, the officer saw Neil Chrisman, who appeared "visibly nervous" when he noticed the officer. Ibid. Officer Daugherty also

2

observed a tray holding marijuana seeds and a pipe he believed was used for smoking marijuana sitting on a desk.  <u>Ibid.</u>  The officer entered the room and obtained Overdahl's and Chrisman's consent to search.  <u>Ibid.</u>  The search yielded more drugs.  <u>Ibid.</u>

It is important to highlight that the Washington Superior Court record does not reflect the moment when Overdahl was placed under arrest.  Notably, while Overdahl was ultimately charged with multiple drug offenses, he was neither charged with nor tried for the alcohol-related offense.  <u>Id.</u> at 1318.

Most critically, the trial court's Memorandum Opinion declined to find Overdahl's original detention to be a formal arrest.  In his motion to suppress before the trial court, Overdahl argued that the drugs should be suppressed because Officer Daugherty did not give him <u>Miranda</u>[2] warnings before asking for identification and following him to his room.  The court noted that Officer Daugherty had "probable cause to make a formal arrest but instead" chose to "offer[] the defendant an opportunity to establish his innocence by proof of age."  The court found that Overdahl was not prejudiced by the lack of <u>Miranda</u> warnings because his identification would have revealed his true age and "[t]he alternative would have been his formal

---

[1]  <u>Miranda v. Arizona</u>, 384 <u>U.S.</u> 436, 86 <u>S. Ct.</u> 1602, 16 <u>L. Ed.</u> 2d 694 (1966).

3

<u>arrest and detention</u> until he could be identified."  (emphasis added).

The underlying facts upon which the Court's holding in <u>Chrisman</u> was made are fundamentally identical to the facts here. When defendant opened the door to the common porch area, the officer detected a strong odor of burnt marijuana.  At that moment -- based upon the scent emanating from the hallway where only two people were standing, including defendant -- Officer Dill had probable cause to believe that a drug offense had been committed.  This is established by our decision in <u>State v. Walker</u>, which the Appellate Division correctly highlighted, wherein we held that "the smell of marijuana itself constitutes probable cause that a criminal offense has been committed and that additional contraband might be present."  213 <u>N.J.</u> 281, 290 (2013) (quoting <u>State v. Nishina</u>, 175 <u>N.J.</u> 502, 516-17 (2003)). Both in <u>Chrisman</u> and here, the officers had probable cause to arrest the individuals.  While neither defendant was placed under arrest yet, the officers had the right, under the circumstances, to ask for identification.  When defendant explained that his identification was in his apartment -- like in <u>Chrisman</u>, where the defendant's identification was inside his dorm room -- the officer reasonably decided to follow him inside.

4

In other words, as in Chrisman, where Officer Daugherty chose not to "formal[ly] arrest and det[ain]" Overdahl even though he was below the legal drinking age and was holding a half gallon of gin, the officer here did not stop, frisk, and "formal[ly] arrest and det[ain]" defendant. Instead, the officer followed defendant to his apartment and ultimately discovered the firearm, just as Officer Daugherty accompanied Overdahl to his dorm room and discovered the drugs. Therefore, contrary to the majority's assertion, Chrisman is factually on point with the case before us, and the Appellate Division should be affirmed.

Our decision in Walker, supra, refers to two cases that provide further support for Officer Dill's conduct here, Nishina, supra, 175 N.J. 502, and State v. Vanderveer, 285 N.J. Super. 475 (App. Div. 1995). In Nishina, supra, an officer was conducting a routine patrol and became suspicious when he observed the defendant and three companions walking in a secluded area three hundred feet from an unoccupied school, late at night. 175 N.J. at 506-07. The officer asked the defendant for identification, including "driver's license, registration, and insurance card," to confirm who owned the car parked across the street, and "to make sure that the car . . . wasn't stolen." Id. at 507 (omission in original). After receiving the requested materials, the officer "smelled a real strong odor

5

of burnt marijuana coming from [the defendant's] clothes." Id. at 508. The officer subsequently patted down the defendant, discovered rolling papers, and saw a bag in the defendant's vehicle that he suspected to contain marijuana. Ibid. The officer then searched the vehicle and found marijuana. Id. at 508-09. This Court found that the officer "had probable cause to believe that [the] defendant possessed illegal narcotics once he detected an odor of marijuana on [the] defendant's clothing." Id. at 517. Further, the bag, along with the scent of marijuana and drug paraphernalia, provided probable cause to suspect that the vehicle contained illegal drugs, and, thus, a warrantless search inside was permissible. Id. at 517-19.

Similarly, in Vanderveer, supra, the panel found that the warrantless search of the defendant, who was alongside N.R. -- the subject of an arrest warrant the officers were executing -- was permissible after officers detected the odor of marijuana. 285 N.J. Super. at 481. While patting down the defendant, the officers found narcotics. Id. at 477. The appellate panel concluded that "[w]hen no contraband was found on N.R., . . . the officer's attention naturally turned to [the] defendant. Probable cause existed that a criminal offense had been committed and that additional contraband might be present. [Thus,] Officer McDonald was permitted to search for contraband of the offense." Id. at 479.

6

Based on Nishina and Vanderveer, it is clear that the officer here had probable cause. As defendant was walking, Officer Dill observed a bulge in his sweatshirt. Because the officer did not know if the bulge was created by a weapon or by narcotics, he could have conducted an immediate search, but instead followed defendant to his apartment for identification. This decision, given the circumstances, does not invalidate the subsequent seizure of the weapon because "probable cause that a criminal offense ha[d] been committed and that additional contraband might be present" did not disappear. Walker, supra, 213 N.J. at 290. Rather, the officer decided to offer defendant an opportunity to retrieve his identification. As the trial court stated in Chrisman, "It is difficult to find criticism of police conduct where an officer has probable cause to make a formal arrest but instead of doing so offers the defendant an opportunity to establish his innocence by proof of age." (emphasis added). That the individual must be placed under formal arrest first, as the majority holds, is an inappropriate limitation on Chrisman and a misunderstanding of the dangerous circumstances in which these situations arise.

In addition, the facts and reasoning behind our holding in Bruzzese support the conclusion that Officer Dill's conduct was reasonable. This Court found in Bruzzese that, despite using an arrest warrant as a pretext, the officers acted reasonably --

7

consistent with the Fourth Amendment of the United States Constitution -- in following the defendant to his bedroom and seizing evidence of an unrelated burglary.  Bruzzese, supra, 94 N.J. at 216, 235.

The Court held that "once a defendant is placed under lawful arrest, the arresting officer has the right to remain at his side and to follow him wherever he chooses to go."  Id. at 232.  We reached this conclusion by balancing the interests of public safety -- "the protection of policemen" -- against the intrusion upon privacy and inconvenience to an individual.  Ibid.  This Court stressed how Chrisman's focus on protecting the police was equally important in its decision.  Id. at 231.  The Court's rationale for adopting Chrisman and finding that the officers acted reasonably given the circumstances applies in both post- and pre-arrest situations.  Unfortunately, in balancing the interests of public safety against "the protection of policemen," the majority has chosen to discount protection of the police officer here.

Whether the individual is arrested or detained, I find there to be an equally present need to protect the police from dangerous situations.  As explained, Officer Dill had probable cause to believe that defendant was involved in criminal conduct.  To let defendant retrieve his identification from his apartment without supervision would expose the officer to risks

8

of a multitude of dangerous or deadly outcomes.  As the Bruzzese Court acknowledged, "[t]he proliferation of handguns poses a constant danger to law enforcement officers.  That danger requires that each patrolman should have the right to monitor the movements of an arrestee to guard against the possibility that he could secure a hidden weapon."  Id. at 233.  I fail to see how this danger is not present in the situation before us today simply because defendant had been detained and not arrested before being escorted to his apartment.

As in Chrisman, Officer Dill reasonably suspected criminality was afoot, so he detained defendant and allowed him to retrieve identification with supervision.  The majority hints that Officer Dill should have conducted a pat-down of defendant the moment he was introduced to the suspicious scenario.  While this may be true in hindsight, an officer should not be so analyzed given his need to make instantaneous decisions.

This is particularly true where, as here, his ultimate decision was a reasonable one.  "There are numerous situations that arise in law enforcement that are unique and call for a special response."  Id. at 228.  Even the Bruzzese holding made clear that a search will not be found unreasonable per se just because "the police officer deviates from standard operating procedure."  Ibid.  Instead, Bruzzese "adopt[ed] the rule that a deviation from standard police practice should be examined on

9

its merits to determine whether it constitutes an unreasonable act."  Ibid.  Indeed, in Bruzzese, where the officer's tactics were manipulative and coy, the Court focused on the objective reasonableness of his conduct under the circumstances.  Id. at 227-39.  Officer Dill's conduct was reasonable under Bruzzese, was not questioned by the trial court, and is consistent with Chrisman.

My position is perfectly summarized by the Appellate Division as follows:

> Federal Courts of Appeals have recognized that "[a]lthough the Supreme Court [in Chrisman] refers to the student as having already been placed under arrest when the officer accompanied him back to his dorm room to retrieve identification, we do not think that this characterization makes Chrisman any less applicable" to a pre-arrest situation.
>
> [State v. Legette, 441 N.J. Super. 1, 19 (App. Div. 2015) (alterations in original) (quoting United States v. Roberts, 612 F.3d 306, 310 n.4 (5th Cir.), cert. denied, 562 U.S. 1116, 131 S. Ct. 839, 178 L. Ed. 2d 570 (2010)).]

Our jurisprudence warrants a similar conclusion in this case.  I would affirm the judgment of the Appellate Division.